In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3314

JEROME R. VAINISI and DORIS L. VAINISI,

*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee*.

Appeal from the United States Tax Court.
Nos. 23699-06, 23701-06—**Maurice B. Foley**, *Judge*.

ARGUED FEBRUARY 23, 2010—DECIDED MARCH 17, 2010

Before BAUER, POSNER, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal from the Tax Court presents an important question concerning the taxation of banks that either (1) are subchapter S corporations or (2) are wholly owned by such corporations and are classified as "qualified subchapter S subsidiaries" ("QSubs"), as is permissible unless they're in one of the categories of "ineligible corporations." 26 U.S.C. §§ 1361(b)(2), (3). Thirty-one percent of all federally insured banks are

either subchapter S corporations or QSubs (by number, not deposits—these banks are mainly small community banks). Federal Deposit Insurance Corporation, *Institution Directory*, www2.fdic.gov/IDASP/main.asp?formname=inst (under "Specialized Categories (FAQ)" drop-down menu) (visited Feb. 24, 2010). The question is whether they can deduct all or merely part of the interest expense that they incur to purchase certain tax-exempt bonds.

The Vainisis own a holding company that in turn owns all the stock of First Forest Park National Bank and Trust Company. Until 1997, both the holding company and the bank were conventional corporations, which in tax-speak are called "C" corporations. But that year the holding company became an S corporation and the bank became a QSub. In 2003 and 2004 the bank earned tax-free interest income on what are called "qualified tax-exempt obligations." 26 U.S.C. § 265(b)(3)(B). The Vainisis deducted from their taxable income the entire interest expense that their QSub bank had incurred in borrowing money with which to buy those obligations. The Tax Court held that the Vainisis were entitled to deduct only 80 percent of that expense; its decision has received a good deal of critical commentary. See Carol Kulish Harvey, "The Application of Section 291 to Subchapter S Banks—A Look at the *Vainisi* Decision," 22(6) *J. Taxation & Regulation of Financial Institutions* 47 (2009); Kristin Hill & Kevin Anderson, "Computing S Corporation Taxable Income: Unraveling the Mysteries of Section 1363(b)," 11(4) *Business Entities* 32, 39-41 (2009); Deanna Walton Harris, Paul F. Kugler & Richard H. Manfreda, "IRS Succeeds with an Unexpected Argument Regarding a QSub Bank," 122 *Tax Notes* 1505 (2009).

Subchapter S allows an eligible corporation to be taxed much as if it were a partnership of its shareholders, see 26 U.S.C. §§ 1361 *et seq.*; S. Rep. 640, 97th Cong., 2d Sess. 2 (1982); Boris I. Bittker & James S. Eustice, *Federal Income Taxation of Corporations and Shareholders* ¶ 6.11, pp. 6-78 to 6-79 (7th ed. 2006)—that is, at the individual rather than the enterprise level. Unlike a C corporation, a partnership is not a taxpayer for purposes of federal income tax. Instead the partnership's income is deemed income of the partners and taxed to them as if they were sole proprietors. 26 U.S.C. § 703. And so with a sub-chapter S corporation: when the Vainisis converted their holding company to an S corporation, the holding company's income became income to the Vainisis, to be reported by them on their personal tax returns. In other words, it passed through to the Vainisis without being taxed at the company level.

As a QSub, the bank owned by the holding company was also disregarded for tax purposes—its income passed all the way through to the Vainisis without being taxed until it reached them. 26 U.S.C. § 1361(b)(3)(A); see Harvey, *supra*, at 47 n. 1, 50-51; James S. Eustice & Joel D. Kuntz, *Federal Income Taxation of S Corporations* ¶ 3.07[3] (2009); Boris I. Bittker, Meade Emory & William P. Streng, *Federal Income Taxation of Corporations and Shareholders: Forms* ¶¶ 6.07[2], [7] (2009). It was as if the Vainisis owned bank assets outright.

Interest that a financial institution (including a bank, 26 U.S.C. §§ 291(e)(1)(B)(i), 265(b)(5), 581, 585(a)(2)) pays on a loan that it uses to purchase a tax-exempt bond or other

tax-exempt obligation (but to simplify exposition we'll generally refer to such obligations as bonds) is generally not deductible from taxable income if the bond had been bought by a financial institution after August 7, 1986, but is deductible if it was bought on or before that date. 26 U.S.C. §§ 265(a), (b)(1), (2). Some of the Vainisis' bank assets, however, consisted of a subset of tax-exempt obligations called "*qualified* tax exempt obligations." 26 U.S.C. § 265(b)(3)(B) (emphasis added). These are tax-exempt bonds that, although bought after August 7, 1986, are treated, if they satisfy certain additional criteria, as if they had been acquired on that date. This allows the taxpayer to deduct interest on the money borrowed to buy them—but not all the interest; sections 291(a)(3) and 291(e)(1)(B) of the Code reduce the permitted deduction by 20 percent, and thus allow only 80 percent of the interest to be deducted. We'll call this the "80 percent rule."

The principle that informs this statutory mosaic, though it is fully implemented only for tax-exempt bonds that are not qualified tax-exempt obligations acquired after August 7, 1986, is that expenses incurred in generating tax-exempt income should not be tax deductible. This is a general principle of income taxation, *Denman v. Slayton*, 282 U.S. 514 (1931); *Wisconsin Cheeseman, Inc. v. United States*, 388 F.2d 420, 422 (7th Cir. 1968); *Levitt v. United States*, 517 F.2d 1339, 1343 (8th Cir. 1975); Joshua D. Rosenberg & Dominic L. Daher, *The Law of Federal Income Taxation* § 4.19[2][b], p. 209 (2008), and would thus imply the zero percent rule applicable to tax-exempt

bonds acquired after August 7, 1986, that are not qualified tax-exempt obligations, rather than the 80 percent rule.

An example will illustrate the underlying principle. Suppose a taxpayer who has income of $10,000 from non-tax-exempt bonds borrows money and uses it to buy tax-exempt bonds and pays interest of $10,000 on the loan. His income from the second set of bonds is by definition tax exempt. If from the $10,000 in income that he obtains from his *non*-exempt bonds he can deduct the interest he paid to obtain the money that he used to buy the tax-exempt bonds, then he pays no tax on his income from the non-exempt bonds either. *Denman v. Slayton*, *supra*, 282 U.S. at 519-20. That is the abuse to which the 80 percent rule is a partial response.

Section 291, the source of the rule, is made applicable to S corporations by section 1363(b)(4), which states that "the taxable income of an S corporation shall be computed in the same manner as in the case of an individual, except that § 291 shall apply if the S corporation (or any predecessor) was a C corporation for any of the 3 immediately preceding taxable years." Section 291 lays down rules relating to corporate preference items. Since S corporations are taxed at the individual rather than the corporate level, this suggests, and the legislative history of section 1363(b)(4) further suggests, that the rules in section 291—including the rule limiting deduction of interest on loans used to acquire qualified tax-exempt obligations—are inapplicable to S corporations in the absence of express statement, such as the "except that . . ." statement which one finds in section 1363(b)(4), quoted

above. "Under Present Law, S Corporations compute their taxable income as an individual, and therefore the provision [section 291] relating to corporate preference items does not apply to an S corporation." H.R. Rep. 432(II), 98th Cong., 2d Sess. 1644 (1984). Thus, for firms that have been S corporations for at least three years and so escape the "except" clause, the zero percent rule and the 80 percent rule are replaced by a 100 percent rule: *all* the interest expense incurred in acquiring qualified tax-exempt obligations is deductible. Section 291 simply isn't applicable to such S corporations.

The three-year waiting period prevents a C corporation from avoiding section 291 by opportunistically switching back and forth between C and S status. Only corporations that really want to be S corporations, as shown by their having adhered to that status for at least three years, are allowed to avoid the burdens that section 291 imposes on C corporations. See H.R. Rep. 432(II), *supra*, at 1644. The Vainisis' subchapter S holding company and QSub bank are such S entities; the earlier of the two taxable years at issue in this case—2003—was six years *after* the Vainisis' holding company converted from C to S corporate status.

Section 291 had been enacted in 1982, though at first it permitted the deduction of 85 percent of the interest on loans used to buy tax-exempt bonds. The percentage was reduced to 80 percent in 1984. That was the same year that subsection (b)(4) of section 1363—the key statute in this case—which states, to repeat, that "the taxable income of an S corporation shall be computed in the

same manner as in the case of an individual, except that § 291 shall apply if the S corporation (or any predecessor) was a C corporation for any of the 3 immediately preceding taxable years"—was added to the tax code.

It was not until 1996 that section 1361 was amended to allow an S corporation to treat a wholly owned subsidiary as a QSub and to allow a bank to become an S corporation or (as in this case) a QSub. This change in the law worried the Internal Revenue Service. It feared that a subchapter S bank might not be subject to provisions of the Internal Revenue Code that impose special rules on banks—including the 80 percent rule in section 291, along with rules relating for example to the sale of bonds and other debt, the determination of interest expense, and the exemption of insolvent banks from federal income tax. 26 U.S.C. §§ 582(c), 1277(c), 7507. A subchapter S bank might be held not to qualify as a bank subject to the special banking rules just because it owned a nonbank QSub; a QSub bank owned by a nonbank subchapter S parent might be held not to be a bank for purposes of those rules; and alternatively whichever entity was the nonbank might be held entitled to *benefits* from the special banking rules that were intended only for banks. Internal Revenue Service, "Subchapter S Banks—Sections 1362 and 265," Notice 97-5, 1997-1 C.B. 352 (Jan. 13, 1997); Harvey, *supra*, at 58; Harris et al., *supra*, at 1506.

To enable the Treasury to eliminate such unintended consequences of the 1996 amendment, Congress the following year, at the urging of the IRS, amended 26

U.S.C. § 1361 to provide, in subsection (b)(3)(A), that "except as provided in regulations prescribed by the [Treasury], . . . a corporation which is a QSub shall not be treated as a separate corporation," that is, separate from its S corporation parent. This "except" clause empowered the Treasury to promulgate regulations that would ensure that the special banking rules are applied to QSubs at the corporate level, that is, before their assets and liabilities and revenues and expenses disappear into the assets and liabilities and revenues and expenses of, in this case, the Vainisis as the owners of the S corporation that owns the QSub bank.

Three years later the Treasury promulgated such a regulation. It provides that "if an S corporation is a bank, or if an S corporation makes a valid QSub election for a subsidiary that is a bank"—as the Vainisis did—"any special rules applicable to banks under the Internal Revenue Code continue to apply separately to the bank parent or bank subsidiary." 26 C.F.R. § 1.1361-4(a)(3). In other words, the special bank rules—including sections 291(a)(3) and 291(e)(1)(B), which allow a bank that has qualified tax-exempt obligations to deduct from its taxable income only 80 percent of the interest on the money it borrowed to buy the bonds—must be applied to an S corporation bank or QSub bank *before* the bank's revenues and expenses are allowed to flow through to the S corporation's shareholders for tax purposes.

But we know from section 1363(b)(4) that section 291, including therefore the 80 percent provision, applies to an S corporation only if it had been a C corporation

within the three years preceding the taxable year in question. The Vainisis' S corporation had not been; and section 291, by its terms, does not apply to such S corporations. The government doesn't want the Vainisis to be allowed this break just because the three-year waiting period has expired. So, noting that their bank is not an S corporation but a QSub, the government argues that section 1363(b)(4) does not apply to the bank because the section does not mention QSubs.

If section 291 does not apply of its own force to S corporations and QSubs, the government's interpretation would exempt *all* QSubs, even those owned by subchapter S corporations that converted from being C corporations in the three years before the taxable year in issue, from the 80 percent rule of sections 291(a)(3) and (e)(1)(B). Suppose a bank that was a C corporation decided it wanted to be an S corporation tomorrow, not three years hence. It would form an S corporation holding company and convert the bank to a QSub. The holding company, not being a bank, would not be subject to the 80 percent rule and under the government's interpretation neither would the bank be, because it would be not a subchapter S corporation but a QSub. That would be contrary to the general principle that a QSub is to be disregarded for tax purposes—that it merges with its S corporation parent.

To close the loophole that its interpretation creates, the government further argues that the "except as provided in regulations" clause in section 1361(b)(3)(A) authorized the Treasury Department to apply section 291 to S corporations or QSubs that are banks even if they

were not C corporations in any of the three previous years. The government argues that because section 291, and the amendment to it that created the 80 percent rule (for remember that originally it was an 85 percent rule), entered the Internal Revenue Code before banks could be subchapter S corporations or QSubs, Congress never intended section 1363(b)(4) to prevent the application of section 291 to banks, and so should be taken to have authorized the Treasury to rescind that application by regulation, as Congress's delegate.

But section 1361(b)(3)(A) doesn't say or hint that. And neither does the regulation, which merely requires that the special banking rules be applied to banks that are S corporations or QSubs at the corporate level so that a bank's S corporation status will not emasculate the rules. A bank is a bank is a bank, whether it is an S or a C corporation.

The regulation gives two examples of how it is meant to apply. 26 C.F.R. § 1.1361-4(a)(3)(ii). One actually involves interest on tax-exempt bonds (the zero deduction provision—section 265(b)). But nothing in either example suggests that section 1363(b)(4) is to be overridden with regard to banks.

Missing from the government's analysis is recognition that the only S corporations to which section 291, the source of the special banking rule at issue in this case (the 80 percent rule), applies are S corporations that were C corporations in one of the three immediately preceding years. Nothing in the regulation suggests a purpose to change *that* rule.

The government's interpretation would deprive certain S corporations, including the Vainisis' bank, of the privileges that Congress gave S corporations that don't fall into the recency exception (the exception for corporations that were C corporations at some time in the preceding three years)—deprive without basis in the language of the regulation or of its authorizing statute. The privileges may be anomalous or even unintended, since section 1363(b)(4) was enacted before banks were allowed to be S corporations or QSubs. But we cannot rewrite statutes and regulations merely because we think they imperfectly express congressional intent or wise social policy. Even if the "except" clause in the 1997 statute authorized the Treasury to repeal the provision that immunizes S banks from section 291, we need at least hints in the text of either the regulation or the authorizing statute that that is what the regulation does, and we can't find any.

Of course, unless abrogated, the privilege conferred by section 1363(b)(4) will perpetuate a competitive advantage enjoyed by S or QSub banks that have never been C corporations or that converted from C to S earlier rather than later. Later converters—not to mention all existing C corporation banks (the majority of all banks)—may be gnashing their teeth in fury at the additional interest deduction that many of their S or QSub bank competitors can take. But the difference in treatment, and whatever consequences flow from it, are built into section 1363(b)(4).

The government suggests, finally, that the regulation may be an attempt to clarify an ambiguity in sections 291

and 1363(b)(4) rather than to rewrite the latter section to treat all S corporation banks as if they had been created within the preceding three years so that none of them would be entitled to the interest deduction. When those sections were enacted, all banks were C corporations and therefore subject to section 291. So Congress may have assumed, if it thought about the matter (of which there's no evidence, however), that sections 291(a)(3) and (e)(1)(B) would apply to all banks even if at a later date some banks were allowed to become S corporations. If this is right, it implies that the purpose of section 1363(b)(4) was merely to apply the other parts of section 291—the parts that don't concern banks—to S corporations unless they had converted from C to S more than three years before the taxable years in question.

The problem with the argument is that there is no ambiguity to disambiguate. What the government really is saying is that the regulation corrects a mistake—that Congress never wanted *banks* to have all the privileges that subchapter S confers, including freeing a bank such as the Vainisis' from section 291. But we need some evidence that the purpose of the regulation was to correct this mistake (if it was a mistake), and we cannot find any such evidence either in the statute that authorized the regulation or in the regulation itself.

It's not as if it would be an absurdity to assume that subchapter S banks receive the same immunity from that section as other subchapter S corporations. Had Congress wanted banks to enjoy none of the benefits that the tax laws confer on such corporations, why did it change its previous policy and allow banks to become S corporations?

The regulation was promulgated a decade ago and the Treasury Department has thus had ample time in which to decide whether the favored treatment of S and QSub banks is a bad idea. The Internal Revenue Service thinks it a bad idea, the Tax Court thinks it a bad idea, but the institutions authorized to correct the favored treatment of these banks—Congress by statute, and the Treasury Department (we are assuming without deciding), as Congress's delegate, by regulation—have thus far left it intact. True, the Treasury has *proposed* to subject all subchapter S banks, no matter how long they have enjoyed that status, to section 291, with its 80 percent rule. "Proposed Subchapter S Bank Regulations," 71 Fed. Reg. 50007 (Aug. 24, 2006). But the proposal has been in limbo for years, its validity questioned on the ground that it contradicts section 1363(b)(4). "Comments of the American Bar Association Section of Taxation on Proposed Regulations Under Section 1363(b)," Nov. 30, 2006, www.abanet.org/tax/pubpolicy/2006/113006scorpbankcomments.pdf (visited Feb. 27, 2010); Harvey, *supra*, at 53; see also Hill & Anderson, *supra*, at 41; Harris et al., *supra*, at 1507. Unless and until such a regulation is adopted (assuming that it would be a valid interpretation of section 1363(b)(4)) or the statute amended, the distinction stands, and exempts the Vainisis from section 291. The judgment of the Tax Court is therefore

REVERSED.